[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-15165

_____

D.C. Docket No. 3:12-cv-00101-CDL

JOANN THORNTON,

Plaintiff-Appellant,

versus

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(February 11, 2015)

Before MARTIN and ANDERSON, Circuit Judges, and COTE,[*] District Judge.

_____

[*] Honorable Denise Cote, United States District Judge for the Southern District of New York, sitting by designation.

PER CURIAM:

Joann Thornton ("Thornton") appeals the district court's order affirming the denial of disability insurance benefits ("DIB") and supplemental security income ("SSI"), pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), by the Commissioner of Social Security ("Commissioner").  We affirm the district court's decision.

## I. BACKGROUND

In the summer of 2007, Thornton filed applications for DIB and SSI, alleging a disability commencing on September 1, 2005 due to fibromyalgia, arthritis, hypertension, and bipolar disorder.  At the time of her application, Thornton was 41 years old and had not worked since September 1, 2005.  For the six years preceding September 1, 2005, Thornton had worked as a clerk/cashier at a discount department store.

Dr. George Ude ("Ude") completed a psychiatric review technique ("PRT")[1] for Thornton on September 21, 2007.  Ude indicated that Thornton had "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes," as well as a medically determinable impairment of anxiety.  Ude also noted that Thornton had moderate difficulties in maintaining social functioning, and mild difficulties in maintaining

---

[1] A psychiatric review technique is a special evaluation used in the disability application process to assess the severity of mental impairments.  See 20 C.F.R. §§ 404.1520a, 416.920a; SSR 96-8p, 1996 WL 374184 at *4 (July 2, 1996).

2

concentration, persistence, or pace.  Ude did not find that Thornton had any limitations in her ability to understand, remember, and carry out simple or detailed instructions.  Ude concluded that Thornton "would not be able to deal with the public in frequent or in depth interactions" and "will have interpersonal difficulties," but that these limits were "not substantial" and "would not preclude [her from] working with other employees."

The Commissioner denied Thornton's applications on September 26, 2007, and again on reconsideration on February 20, 2008.  On March 21, 2008, Thornton requested a hearing before an ALJ.  The hearing was held on January 7, 2010.  The evidence at the hearing included testimony from Thornton and John Blakeman, a VE, as well as medical records.

A second PRT, completed by Dr. Steve O'Hagan ("O'Hagan") on February 15, 2008, was considered at the hearing.  In this report, O'Hagan indicated that Thornton had a medically determinable impairment of depression, as well as "moderate difficulties maintaining concentration, persistence, or pace."  O'Hagan indicated that Thornton also had moderate limitations in her ability to understand, remember, and carry out detailed instructions, and to maintain concentration for extended periods.  He concluded, however, that her ability to understand, remember, and carry out simple instructions was not significantly limited and her concentration was adequate for basic activities.

3

At the ALJ hearing, the VE testified as to the existence of jobs in the national economy for the claimant in response to a hypothetical posed by the ALJ. The ALJ asked the VE to assume that the claimant is 44 years old, possesses a GED, and has worked in the past as a cashier/checker and stocker. It was assumed that neither job provided any transferrable skills. The ALJ also asked the VE to assume that the claimant could perform "medium work"[2] but is restricted from frequent or repetitive stooping, crouching, kneeling, crawling, or climbing, and is further limited to "simple, non-detailed tasks" that did not involve dealing with the public or cooperative efforts with coworkers. The VE testified that jobs existed for an individual with the aforementioned limitations in the national and regional economy.[3] The jobs identified by the VE included commercial or institutional cleaner, motel cleaner, packer, laundry sorter, small item sorter, and ticket seller.

At the hearing, Thornton advised the ALJ that she was scheduled to be seen within a few days at a mental health clinic. On January 11 2010, Dr. J. D. Hubbard ("Hubbard"), a psychiatrist, completed an assessment of Thornton. Based on his interview with Thornton on that day, and what he described as incomplete medical

---

[2] Medium work is defined as work that "involves lifting no more lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). If an individual can perform medium work, she can also do sedentary and light work. Id.

[3] In total, the VE estimated that there were over 100,000 jobs in the regional economy, and over 4.5 million jobs in the national economy for a person with the hypothetical limitations described by the ALJ.

records, Hubbard found that "she is not employable."  He found Thornton

"agitated, tearful [and] angry," noting that "in this state [she] could not be expected

to work."  Hubbard checked each of the eight boxes related to an individual's

ability to make an occupational adjustment and in each classified Thornton as

having "Poor/No[]" skills, which was the most impaired category on the form.

These eight categories included the ability to relate to coworkers, interact with

supervisors, deal with the public, and maintain attention/concentration.  Hubbard

gave Thornton a Global Assessment of Functionality ("GAF") score of 41,[4] and

prescribed medication and treatment.  Hubbard saw Thornton again on January 26.

Hubbard noted that the medication she had started taking following the January 11

appointment had not resulted in increased mood stabilization and recommended

increasing the dosage.

In response to a request from Thornton's counsel, Dr. Justin Huthwaite

("Huthwaite"), a clinical psychologist and consultative examiner for the Social

Security Administration ("SSA"), completed a psychological evaluation of

Thornton on April 16, 2010.  Huthwaite assessed Thornton's IQ as 66, which is in

the mildly mentally retarded range.  Huthwaite's diagnostic impressions of

Thornton included major depressive disorder and borderline intellectual

---

[4] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., Text Revision 2000).

5

functioning.  Huthwaite concluded that Thornton could follow simple instructions, but would experience difficulties following more complex instructions.  Huthwaite expected that if she were employed, Thornton would work at a slightly reduced pace, but noted that she is likely to be able to persist with tasks.  Huthwaite also recommended intermittent supervision of Thornton at work.

In an opinion issued on June 7, 2010, the ALJ concluded that Thornton was not disabled from September 1, 2005 through June 7, 2010, as defined by the Social Security Act, employing the five-step sequential evaluation process set out in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  With respect to the first three steps of the sequential evaluation process, the ALJ concluded that (1) Thornton had not engaged in substantial gainful activity since September 1, 2005; (2) she had severe impairments of arthralgia/fibromyalgia, major depressive disorder, hypertension, borderline intellectual function, and a history of polysubstance abuse in sustained full remission; and (3) her physical and mental impairments did not meet or medically equal a listed impairment.

In determining that her mental impairments did not rise to the level of a listed impairment, the ALJ discussed in detail the medical evidence related to Thornton's mental impairments, including her history of depression and bipolar disease, which affected her ability to interact with others.  The ALJ recognized that Hubbard had assigned Thornton a GAF score of 41, rated her as having "poor-to-

no capacities" in almost all vocational areas, and concluded that she was unable to work. In a footnote, the ALJ noted that GAF scores do not necessarily reflect an ability to work as there is no correlation between GAF scores and disability. The ALJ observed that Thornton's condition appeared to have been worsened in January 2010, both during the hearing and Hubbard's examination, because a significant relationship in Thornton's life had ended in September 2009 and she had discontinued taking her medications. By April 2010, however, when she was examined by Huthwaite, she was back on medication and participating in mental health therapy. As a result, the ALJ concluded that her residual functional capacity ("RFC") had returned to its September 2009 baseline.[5]

At the fourth step in the evaluation process, the ALJ concluded that Thornton was unable to perform any prior work, but had the RFC to perform "medium work" with some limitations—specifically, that she could not frequently or repetitively stoop, crouch, crawl, or climb. As a further restriction, the ALJ added that Thornton was limited to simple, non-detailed tasks without public interaction or cooperation with co-workers.

At step five, the ALJ concluded that, based on the VE's testimony, work meeting these limitations existed in significant numbers in the national economy. Because Thornton was capable of making an adjustment to other jobs that existed

---

[5] An RFC is an administrative assessment of the extent to which an individual's impairments may affect her capacity to do work. 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p at *2.

7

in significant numbers in the national economy, the ALJ found that Thornton was not disabled.

Thornton timely appealed the ALJ's decision to the Appeals Council.  In support of her appeal, Thornton submitted an evaluation conducted by Dr. Harvey Gayer ("Gayer") on December 6, 2010.  Thornton argued that Gayer's evaluation constituted new medical evidence corroborating Hubbard's conclusions regarding her inability to work.  The Appeals Council did not add Gayer's evaluation to the administrative record.  On June 7, 2012, the Appeals Council denied Thornton's request for review.

On August 7, 2012, Thornton timely sought district court review of the ALJ's decision.  In a report and recommendation issued on August 23, 2013, the magistrate judge found that Thornton's inability to cooperate with coworkers did not render her disabled, the hypothetical the ALJ posed to the VE was complete, the ALJ had correctly noted the lack of correlation between a GAF score and a disability determination, and the Appeals Council did not err in denying review of or in refusing to consider Gayer's evaluation.  On September 11, 2013, over Thornton's objections, the district court adopted the magistrate judge's report affirming the ALJ's decision.  This appeal followed.

8

## II. DISCUSSION

In Social Security appeals, we review the decision of an ALJ as the final decision by the Commissioner when the ALJ denies benefits and the Appeals Council denies review of the ALJ's decision. Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001). "We review the Commissioner's decision to determine if it is supported by substantial evidence and based on proper legal standards." Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam) (citation omitted); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Crawford, 363 F.3d at 1158 (citation omitted). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (citation omitted). "Even if the evidence preponderates against the Commissioner's factual findings, we must affirm if the decision reached is supported by substantial evidence." Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1260 (11th Cir. 2007) (citation omitted). "[W]e review de novo the Commissioner's conclusions of law." Id.

Eligibility for DIB and SSI requires that the claimant be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1)-(2). A claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In order to determine whether a claimant is disabled, the Commissioner applies a five-step sequential evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999).

> At the first step, the claimant must prove that she has not engaged in substantial gainful activity. At the second step, she must prove that she has a severe impairment or combination of impairments. If, at the third step, she proves that her impairment or combination of impairments meets or equals a listed impairment, she is automatically found disabled regardless of age, education, or work experience. If she cannot prevail at the third step, she must proceed to the fourth step where she must prove that she is unable to perform her past relevant work. At the fifth step, the burden shifts to the Commissioner to determine if there is other work available in significant numbers in the national economy that the claimant is able to perform. If the Commissioner can demonstrate that there are jobs the claimant can perform, the claimant must prove she is unable to perform those jobs in order to be found disabled.

Jones, 190 F.3d at 1228 (citations omitted).

In bringing this appeal, Thornton has relied on several Social Security Rulings ("SSR"). SSRs are "agency rulings published under the authority of the Commissioner of Social Security and are binding on all components of the

10

Administration." Sullivan v. Zebley, 493 U.S. 521, 530 n.9 (1990) (citation omitted). SSRs "do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984). Although SSRs are not binding on this court, we accord the rulings deference. Fair v. Shalala, 37 F.3d 1466, 1469 (11th Cir. 1994).

Thornton has appealed from the Commissioner's denial of her claim for benefits on four grounds. She contends that all unskilled work requires the ability to cooperate with co-workers, and, because the ALJ found that she was unable to do this, she is disabled as a matter of law. Thornton also contends that the hypothetical given to the VE was inadequate. Thornton further argues that the ALJ was required to consider her GAF scores in determining whether she was disabled. Finally, Thornton contends that the Appeals Council erred by not adding Gayer's post-decision evaluation to the administrative record. None of these issues requires a reversal or remand.

A.    Ability to Cooperate with Coworkers

Thornton contends that the Commissioner was required to find her disabled because the Commissioner did not meet his burden at the fifth step in the sequential evaluation process. At the fifth step in the sequential process, the Commissioner must establish that significant numbers of jobs exist in the national

11

economy that the claimant can perform.  Jones, 190 F.3d at 1228 (citation omitted); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner may show through the testimony of a VE that such jobs exist.  Winschel v. Commissioner of Social Security, 631 F.3d 1176, 1180 (11th Cir. 2011).

The ALJ concluded Thornton was unable to cooperate with co-workers, and described her as a person with a "long history" of depression or bipolar condition that has "long affected her ability to deal with others."  In the hypothetical he posed to the VE, he asked to VE to assume that Thornton could not perform tasks that involved "cooperative efforts with co-workers."  Relying on SSRs 85-15, 1985 WL 56857 (Jan. 1, 1985), 96-8p, and 96-9p, 1996 WL 347185 (July 2, 1996), Thornton contends that the Commissioner has determined that cooperation with co-workers is required for all work.[6]  Citing SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000), Thornton argues that, because the VE's testimony conflicts with SSRs 85-15, 96-8p, and 96-p, the Commissioner cannot rely upon it at step five in the sequential evaluation process.

The SSRs cited by Thornton do not require the Commissioner to find that a claimant is disabled when the claimant is unable to cooperate with co-workers. While SSRs 85-15 and 96-9p each recognize that unskilled work generally requires

---

[6] The Commissioner contends that SSRs 85-15 and 96-9p do not apply to Thornton's case. We assume, without deciding, that the SSRs cited by Thornton apply to her case. We further assume for the purposes of this appeal that Thornton lacks the ability to "respond appropriately to co-workers" because she cannot cooperate with co-workers.

the ability to "respond appropriately to supervision, coworkers, and usual work situations," SSR 85-15 at *4; SSR 96-9p at *9, they do not command a finding of disability in the absence of such ability. See SSR 85-15 at *4 (noting that a substantial loss of the ability to "respond[] appropriately to supervision, coworkers, and usual work situations" would justify, but not require, a finding of disability); SSR 96-9p at *9 (same); see also SSR 96-8p (recognizing that "competitive, remunerative work" generally requires the ability to respond appropriately to co-workers). Indeed, the SSRs themselves recognize that any finding of disability must be "based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations . . . ." SSR 85-15 at *1; see also SSR 96-9p at *9. Furthermore, SSR 96-9p specifically recommends consulting a VE when an individual is limited in a basic work activity such as the ability to respond appropriately to co-workers. Id. Contrary to Thornton's argument before the district court and on appeal, the fact that a finding of disability may be justified does not mean that a finding of disability is required. Because there was no conflict with underlying Social Security policies, the Commissioner was entitled to rely on the VE's testimony at step five of the sequential evaluation process. Thus, the ALJ did not err in finding that Thornton was not disabled after concluding that she could not cooperate with coworkers.

13

B.    The Hypothetical Question Posed to the VE

Thornton next argues that the ALJ's decision was not supported by substantial evidence because the hypothetical presented to the VE was incomplete. In order for a VE's testimony to constitute substantial evidence in support of a finding that there is sufficient work available in the economy that the claimant can perform at the fifth step in the sequential evaluation process, the ALJ must pose a hypothetical question to the VE "which comprises all of the claimant's impairments." Winschel, 631 F.3d at 1180 (citation omitted).  Thornton argues that the hypothetical was incomplete because it did not specifically refer to her limitations in concentration, persistence, and pace or Huthwaite's recommendation that there be intermittent supervision of her work.  The failure to include either limitation in the hypothetical did not render it incomplete.

In Winschel, we observed that "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." Id. at 1180.  Nonetheless, in Winschel we concluded that the VE's testimony did not constitute substantial evidence to support the ALJ's decision at step five of the process.  Id. at 1181.  In that case, the ALJ did not indicate that medical evidence suggested that the plaintiff's ability to work was unaffected by

14

his concentration, persistence, and pace limitations. Id. Nor did the ALJ otherwise implicitly account for the limitation in the hypothetical question. Id.

Here, unlike in Winschel, the ALJ determined that the evidence demonstrated that Thornton could engage in simple, non-detailed tasks, despite "moderate" limitations in concentration, persistence, and pace.[7] The hypothetical the ALJ posed specified that the VE should assume that Thornton could only perform "simple, non-detailed tasks." There was substantial evidence to support this determination. O'Hagan found that Thornton could understand, remember, and carry out simple instructions. He noted that Thornton had a moderate limitation in her ability to sustain concentration for extended periods, that this limitation was not substantial and her concentration was adequate for basic activities, that she could sustain attention for two-hour segments, and that all other aspects of concentration and persistence were intact. Huthwaite indicated that Thornton appeared capable of performing simple tasks without difficulty, but that she may experience difficulty following more complex instructions. He noted that, if employed, Thornton would be expected to work at a slightly reduced pace, but that she was likely to persist with work-related tasks. The ALJ also adequately

---

[7] In completing their evaluations of Thornton, Ude, O'Hagan, and Huthwaite determined that Thornton had—at most—only moderate limitations in maintaining concentration, persistence, and pace. The PRT form classifies impairments to limitations in maintaining concentration, persistence, or pace as mild, moderate, marked, or extreme. A marked or extreme impairment will be considered at the third step in the sequential process when determining whether the claimant's mental impairment meets or medically equals an impairment listed in Appendix A. 20 C.F.R. §§ 404, Subpt. P, App. 1, 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

accounted for Hubbard's assessment, which found that in January 2010, Thornton lacked the ability to engage in even simple tasks. Based on these considerations, the ALJ properly determined that Thornton could perform simple, non-detailed tasks despite her moderate limitations in maintaining concentration, persistence, and pace. Therefore, the ALJ's hypothetical was not deficient because it did not specifically refer to Thornton's limitations in maintaining concentration, persistence, and pace.

Likewise, Thornton's argument that the hypothetical to the VE was incomplete because the ALJ failed to include any reference to Thornton's need for intermittent supervision is without merit. In assessing Thornton's ability to work, Huthwaite indicated that intermittent supervision was "recommended." He did not indicate that intermittent supervision was required as opposed to merely recommended. Nor did he explain what intermittent supervision would entail, or proffer a rationale for his recommendation. Nothing in Huthwaite's evaluation indicates that this recommendation meant that Thornton had a specific limitation as to supervision that should have been explicitly or implicitly included in the ALJ's RFC and in the hypothetical presented to the VE. Thornton offers nothing more than her own opinion that Huthwaite's observation about the desirability of intermittent supervision means that she requires more than normal supervision.

16

Moreover, contrary to Thornton's argument on appeal, SSR 85-15 does not provide that an individual who cannot work without normal supervision is disabled. Instead, SSR 85-15 merely acknowledges that unskilled work generally involves some supervision. See SSR 85-15 at *4 (noting that one of the basic mental demands of unskilled work is the ability to respond appropriately to supervision). Accordingly, the ALJ's hypothetical to the VE adequately accounted for Thornton's limitations. Because the hypothetical is not incomplete, the VE's testimony constitutes substantial evidence supporting the ALJ's finding that the Commissioner met its burden in showing that there was work in the national economy that the claimant could perform. See Winschel, 631 F.3d at 1180–81.

C.    Consideration of GAF Scores

Thornton next argues that the ALJ erred by failing to evaluate one of her GAF scores from May 2006 in formulating her RFC and by observing that there is "no correlation" between GAF scores and a finding of disability. The RFC is an assessment of the extent to which a claimant's impairments may affect her capacity to work. 20 C.F.R. §§ 404.1545 (a)(5), 416.945(a)(5). The RFC evaluation is used in the fourth and fifth steps of the sequential process to determine whether the claimant can perform past work and, if not, whether the claimant can perform other work in the national economy. Id. While the RFC assessment "must be based on all of the relevant evidence in the case record," SSR 96-8p at *5, GAF scores are

not sufficiently pertinent to the ability of an individual to work to require an ALJ to list every GAF score that appears in the medical records. The relevant inquiry is whether there is substantial evidence to support the Commissioner's finding.

A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, supra, at 32. The GAF scale accounts for psychological, social, and occupational limitations, but not environmental or physical impairments. Id.  GAF scores between 41 and 50 indicate serious symptoms. Id. at 34.  The Commissioner has concluded, however, that the GAF scale "does not have a direct correlation to the severity requirements in [the] mental disorders listings."  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000).  As the Sixth Circuit has observed, GAF scores may be helpful in formulating a claimant's RFC, but are not essential to the RFC's accuracy, and an ALJ's failure to describe GAF scores does not render the ALJ's RFC assessment inaccurate.  Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002).  Similarly, the Eighth Circuit has recognized that a GAF score may have little or no bearing on a claimant's social and occupational functioning.  Jones v. Astrue, 619 F.3d 963, 973 (8th Cir. 2010).  Here, the ALJ's decision was supported by substantial evidence even though the ALJ did not refer to each of Thornton's GAF scores.

In a footnote, the ALJ explained that a GAF score does not necessarily reflect a person's ability to work and, citing the Federal Register, added that there is "no correlation" between GAF score and a disability.  The section of the Federal Register provides: "[The GAF Scale] does not have a direct correlation to the severity requirements in [the SSA's] mental disorders listings."  65 Fed. Reg. 50746, 50764–65.  Although the ALJ's description of the passage in the Federal Register was an overstatement, that overstatement does not require either a reversal or a remand.  See Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error doctrine to a Social Security appeal).  The ALJ correctly noted that the GAF scores do not necessarily reflect a person's ability to do work.  Additionally, the ALJ's decision reflects that he did consider with care the various medical providers' evaluations and discussions of Thornton's symptoms and limitations.  Therefore, the ALJ did not err in failing to discuss all of Thornton's GAF scores, and the RFC assessment is supported by substantial evidence.

D.     New Evidence Before the Appeals Council

Finally, Thornton argues that the Appeals Council erred in refusing to add Gayer's December 2010 psychiatric evaluation of Thornton to the administrative record.  A claimant is generally permitted to "present new evidence at each stage of [the] administrative process."  Ingram, 496 F.3d at 1261 (citation omitted).  The Appeals Council is required under the relevant regulations to consider evidence

that relates to the period on or before the date of the ALJ decision. 20 C.F.R. §§ 404.976(b)(1), 416.1476(b)(1). Evidence that postdates that period, however, is to be returned to the claimant. Id. We review de novo a district court's decision regarding the necessity of a remand to the Commissioner based on new evidence. Vega v. Comm'r of Soc. Sec., 265 F.3d 1214, 1218 (11th Cir. 2001).

Gayer evaluated Thornton on December 6, 2010, six months after the ALJ issued his decision. Gayer found, among other things, that Thornton was suffering from a major depressive disorder, that her IQ score was borderline, and that her GAF score was 50. Thornton argues that Gayer's evaluation indicates that the ALJ erred in concluding that Thornton had improved between January 2010, when Hubbard found Thornton to be unable to work, and April 2010, when Huthwaite examined Thornton.

Where a claimant seeks review of the Commissioner's final decision, the district court has two methods—each addressing a different problem—for remanding a case back to the Commissioner under 42 U.S.C. § 405(g). Ingram, 496 F.3d at 1261. The first method, known as a sentence-four remand, is "based upon a determination that the Commissioner erred in some respect in reaching the decision to deny benefits." Jackson v. Chater, 99 F.3d 1086, 1095 (11th Cir. 1996). A sentence-four remand is applicable when evidence was properly before the Commissioner, but "the Appeals Council did not adequately consider the

20

additional evidence." Ingram, 496 F.3d at 1268 (citation omitted).  A sentence four remand is warranted only where the Commissioner's decision was not supported by substantial evidence or where the Commissioner or ALJ incorrectly applied the relevant law.  Moore v. Barnhart, 405 F.3d 1208, 1210 n.2 (11th Cir. 2005) (per curiam).

The second method, a sentence-six remand, is not based on error, but rather is available if new, material evidence becomes available to a claimant, and the claimant could not have presented that evidence during the administrative proceeding.  Ingram, 496 F.3d at 1267; Jackson, 99 F.3d at 1095.  Material evidence is both "relevant and probative," creating "a reasonable possibility that it would change the administrative result."  Vega, 265 F.3d at 1218.  Such evidence must be noncumulative.  Id.  For new evidence to be relevant, it must relate to the time period on or before the date of the ALJ's decision.  See Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999) (per curiam) (a doctor's opinion given one year after the ALJ's decision was not probative as to any issue on appeal); cf. 20 C.F.R. §§ 404.970(b), 416.1470(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ] hearing decision.") (emphasis added).  Evidence of deterioration of a previously-considered condition may subsequently entitle a claimant to benefits from a new application, but it is not relevant to the

21

issue of disability during the specific period under review. See Wilson, 179 F.3d at 1279 n.5. The district court is not authorized by sentence six "to remand for reconsideration of evidence previously considered by the Appeals Council." Ingram, 496 F.3d at 1269.

Regardless of which part of Section 405(g) applies, the district court did not err in refusing to remand Thornton's case. The district court correctly refused to remand Thornton's case under sentence six because Gayer's evaluation addressed Thornton's condition after the ALJ's decision. See Wilson, 179 F.3d at 1279. Gayer's evaluation on December 6, 2010, describes Thornton's conduct, appearance, and behavior at the evaluation, and explicitly notes that the evaluation is of Thornton's current functioning. At most, Gayer's evaluation shows that Thornton's condition had deteriorated since the ALJ issued his decision, which does not warrant a remand. See Wilson, 179 F.3d at 1278–79.

Likewise, the district court did not err in refusing to remand under sentence four because Gayer's evaluation did not show that the Commissioner's decision was not supported by substantial evidence or resulted from an incorrect application of the law. Because the evaluation relates to Thornton's condition following the ALJ's decision, it is not relevant to the question of the whether the Commissioner's decision was supported by substantial evidence. Furthermore, the decision not to consider the evidence was not contrary to law. The regulations do

22

not require the Appeals Council to consider evidence that postdates the ALJ's decision, and in fact direct the Appeals Council to return such evidence to the claimant.  20 C.F.R. §§ 404.976(b)(1), 416.1476(b)(1).  Accordingly, the district court did not err in refusing to remand the case under sentence four.

## III. CONCLUSION

We have considered the other arguments raised by Thornton and find them to be without merit.

**AFFIRMED.**